USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  4/17/15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
JUAN C. GOMEZ,                                          :
                                                       :
                              Plaintiff,               :
                                                       :
                   -v.-                                 :
                                                       :
RABBI CHILL and R. KOSKOWSKI,                          :
                                                       :
                              Defendants.              :
-----------------------------------------------------X

**REPORT AND
RECOMMENDATION**

11-CV-6844 (CM) (JLC)

**JAMES L. COTT, United States Magistrate Judge.**

**To the Honorable Colleen McMahon, United States District Judge:**

*Pro se* plaintiff Juan C. Gomez, a prisoner currently incarcerated at Marcy Correctional Facility in Marcy, New York, has brought this action pursuant to 42 U.S.C. § 1983 alleging violations of his constitutional rights while he was incarcerated at Green Haven Correctional Facility ("Green Haven"), in Stormville, New York. Two of Gomez's allegations survived defendants' motion to dismiss: (1) that Rabbi Chill, Green Haven's Jewish chaplain, did not provide adequate accommodation of Gomez's religious beliefs in violation of the First Amendment, and (2) that Raymond Koskowski, then the Deputy Superintendent of Security at Green Haven, was deliberately indifferent to Gomez's need for adequate medical care in violation of the Eighth Amendment. Following the conclusion of discovery, Rabbi Chill and Koskowski (together, "Defendants") have now moved for summary judgment. Gomez did not submit any papers in opposition to Defendants' motion. For the reasons that follow, I recommend that Defendants' motion for summary judgment be granted.

I.   **BACKGROUND**

A.   **Factual Background**

On May 15, 2008, Gomez arrived at Green Haven, having been transferred from Sing Sing Correctional Facility.  *See* Defendants' Local Rule 56.1 Statement dated Dec. 12, 2014 ("Rule 56.1 Stmt."), ¶ 6 (Dkt. No. 133); Declaration of Assistant Attorney General Michael F. Albanese dated Dec. 12, 2014 ("Albanese Decl."), Ex. B (Chronological Entry Sheet, GOMEZ180) (Dkt. No. 135).[1]  Following allegations that he attempted to solicit the assault of a Green Haven corrections officer, Gomez was moved to Green Haven's Special Housing Unit ("SHU") on September 23, 2008.  Rule 56.1 Stmt. ¶¶ 26-27.  He remained in the SHU from September 23 through November 28, when he was transferred to Coxsackie Correctional Facility.  *Id.* at ¶ 15.

Gomez alleges that, on September 23, 2008, the same day he received an Inmate Misbehavior Report related to the attempted assault, he was himself assaulted by several Green Haven corrections officers before being taken to the SHU.  *Id.* at ¶¶ 26, 28.  A member of Green Haven's nursing staff examined Gomez

---

[1] "A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible." *Biberaj v. Pritchard Indus., Inc.*, 859 F. Supp. 2d 549, 553 n.3 (S.D.N.Y. 2012) (quoting *T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009)). However, a court "may in its discretion opt to 'conduct an assiduous review of the record' even where one of the parties has failed to file such a statement." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation omitted). To that end, the Court ordered Defendants to provide the entire transcript of Gomez's deposition and, accounting for Gomez's *pro se* status, will consider this testimony as if it had been presented in opposition to the motion. *See, e.g., Laster v. Mancini*, No. 07-CV-8265 (DAB) (MHD), 2013 WL 5405468, at *23 (S.D.N.Y. Sept. 25, 2013) (using plaintiff's deposition to determine whether there were any factual disputes).

on his way to the SHU, but did not observe any injuries. *Id.* at ¶¶ 29-32. She did note that Gomez was "crying uncontrollably," however. *Id.* at ¶ 30. A few hours later, Green Haven staff found Gomez sobbing on the floor of his cell, and medical personnel "noted swelling in [Gomez's] right leg." *Id.* at ¶¶ 33-34. They therefore transferred Gomez to Putnam Hospital Center for an x-ray. *Id.* at ¶¶ 34-35. The staff at Putnam Hospital determined that Gomez's right leg was not fractured, and discharged him with a diagnosis of "contusion," prescribing him Vicodin, although they advised a course of Motrin, ice, and elevation. *Id.* at ¶¶ 36-38.

Upon his return to Green Haven, Gomez remained in the infirmary overnight for observation. *Id.* at ¶ 39. A doctor discharged Gomez back to the SHU the following day. *Id.* at ¶ 40. Over the next three days, Gomez received daily visits from Dr. Bentivegna, a physician at Green Haven, during which he noted that Gomez suffered from "mild soft tissue trauma" and described developing bruising ("ecchymosis") on Gomez's right thigh and knee. *Id.* at ¶¶ 41-50. Dr. Bentivegna's notes reflect that, on two occasions, he invited Gomez to sit because he appeared to be in discomfort, but each time, Gomez refused. *Id.* at ¶¶ 42, 49. Dr. Bentivenga's notes also reflect that, despite Gomez's requests, he determined that crutches or a cane were not necessary. *Id.* at ¶¶ 46, 49.

Dr. Bentivegna subsequently treated Gomez on three other occasions over the next month for complaints related to the assault. *Id.* at ¶¶ 51-58; Albanese Decl., Ex. C (excerpted medical records, GOMEZ104). During the first two of these visits, Gomez again requested crutches, but Dr. Bentivegna again deemed them unnecessary. *Id.* at ¶¶ 53, 56. Instead, he recommended that Gomez begin "gentle stretching" to address

his alleged limited range of motion. *Id.* at ¶ 58. By October 27, when Dr. Bentivegna

treated Gomez for an unrelated issue, Gomez commented that his leg was "feeling

better," and Dr. Bentivegna noted that Gomez's gait was "much improved." *Id.* at ¶ 59;

Albanese Decl., Ex. C (Ambulatory Health Record Progress Note, dated Oct. 27, 2008,

GOMEZ103).

Gomez contends that, while he was in the SHU, he attempted to file two

grievances related to his alleged assault by corrections officers.  (Dkt. No. 144)

(Transcript of Juan C. Gomez's September 24, 2014 Deposition ("Gomez Dep."), 42-44,

48-51).  Gomez believes that these grievances were intercepted by a corrections

officer who subsequently threatened Gomez not to file any other grievances. *Id.* at

42-45.  Regardless of the truth of these allegations, after hearing nothing in

response to either of his grievances, Gomez did not appeal to Green Haven's

superintendent or to the Central Office Review Committee, as required under the

prison's regulations.  Rule 56.1 Stmt. ¶ 25; Gomez Dep. at 56-57.

During this same time period, Gomez had a disciplinary hearing on the assault

solicitation charge.  Rule 56.1 Stmt. ¶ 61.  The hearing began on October 1, 2008, and

concluded on November 7, after multiple adjournments, with the charge against Gomez

dismissed. *Id.*; Declaration of Raymond Koskowski dated Dec. 2, 2014 ("Koskowski

Decl."), ¶ 6 (Dkt. No. 138).  Gomez claims that, at some point during this hearing,

Koskowski observed him "hopping on one leg" as a result of his injuries, but declined to

transfer him from the SHU to the infirmary, where Gomez believes he would have been

entitled to use crutches.  Gomez Dep. at 109; *see also id.* at 178-79; Rule 56.1 Stmt.

¶ 60.  This interaction with Koskowski forms the basis of Gomez's claim against him for

deliberate indifference to his medical needs. Koskowski denies that he saw Gomez walking with any difficulty, Koskowski Decl. ¶ 3, but there is no question that Gomez remained in the SHU until his transfer to another prison facility. Rule 56.1 Stmt. ¶¶ 15, 62-63.

Gomez has also asserted claims against Rabbi Chill, Green Haven's Jewish chaplain. Gomez describes himself as a Messianic Jew, and has alleged that, while incarcerated at Green Haven, Rabbi Chill denied his requests to receive kosher meals and to attend Jewish services. Amended Complaint ("Am. Compl."), at ¶ 4 (Dkt. No. 20); Gomez Dep. at 84-85. The record reflects that Green Haven officials approved Gomez's request for kosher meals on August 4, 2008, and Gomez began receiving kosher meals within one week. Rule 56.1 Stmt. ¶¶ 12-13. By contrast, the number and dates of the Jewish services that Gomez requested to attend or was prevented from attending are not in the record.

## B.    Procedural History

Gomez initiated this action on September 16, 2011 against defendants Rabbi Chill, Green Haven Superintendent Robert Ercole, and various John Does. *See* Inmate Civil Rights Complaint Pursuant to 42 U.S.C. § 1983 (Dkt. No. 1). After Gomez amended his complaint to incorporate the names of the John Does identified by the New York State Department of Corrections and Community Supervision ("DOCCS") pursuant to *Valentin v. Dinkins*, 121 F.3d 72 (2d Cir. 1997), (Dkt. No. 20), defendants moved to dismiss the Amended Complaint on various grounds, including failure to exhaust, the statute of limitations, and failure to state a claim. (Dkt. Nos. 91-92). Gomez did not file any papers in opposition to defendants' motion, despite the Court

granting several extensions of his time to do so. (Dkt. Nos. 104, 107). By Order dated June 18, 2014, Judge McMahon adopted in its entirety the Court's Report and Recommendation to grant in part and deny in part defendants' motion to dismiss the Amended Complaint. *See JCG v. Ercole*, No. 11-CV-6844 (CM) (JLC), 2014 WL 1630815 (S.D.N.Y. Apr. 24, 2014), *adopted by*, 2014 WL 2769120 (S.D.N.Y. June 18, 2014) (Dkt. Nos. 118, 120). As a result of the motion to dismiss, only two of Gomez's claims remain against only two of the defendants: his First Amendment claim for denial of religious accommodation against Rabbi Chill and his Eighth Amendment claim for deliberate indifference to his medical needs against Koskowski. The Court then set a schedule for discovery and motion practice. (Dkt. No. 121).

After the conclusion of discovery, Rabbi Chill and Koskowski moved for summary judgment on December 14, 2014. *See* Notice of Motion for Summary Judgment (Dkt. No. 131); Rule 56.1 Stmt. (Dkt. No. 133); Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Defs. Mem.") (Dkt. No. 134); Albanese Decl. (Dkt. No. 135); Declaration of Karen Bellamy dated Dec. 3, 2014 ("Bellamy Decl.") (Dkt. No. 136); Declaration of Rabbi Chill dated Dec. 9, 2014 ("Chill Decl.") (Dkt. No. 137); Koskowski Decl. (Dkt. No. 138). On January 21, 2015, after his time to oppose Defendants' motion had passed, Gomez requested that the Court stay its adjudication of the summary judgment motion until he was able to retrieve certain of his legal materials that he had been forced to send home. (Dkt. No. 140-1). The Court did not issue a stay, and instead extended Gomez's time until March 2, 2015 to submit any response to the motion. (Dkt. No. 141). By letter dated February 27, Gomez renewed his request for a stay based on the same grounds, which the Court denied.

6

(Dkt. Nos. 146-47; *see also* Dkt. No. 148). Having received nothing further from Gomez, the Court considers the motion fully submitted.

## II.   DISCUSSION

### A.   Standard of Review on Motion for Summary Judgment

Summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact" and that he "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013). A fact is material if it "might affect the outcome of the suit under the governing law" of the claims involved. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute as to a material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012) (citation omitted). A party cannot rely on "conclusory allegations or unsubstantiated speculation" at summary judgment. *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (citation omitted). Rather, parties must cite to "particular parts of materials in the record," including depositions, documents, affidavits, declarations, and admissions in support of its assertions, or show that the adverse party "cannot produce admissible evidence" to support its own asserted facts. Fed. R. Civ. P. 56(c)(1)(B).

"The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (citation omitted); *accord Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1224 (2d Cir. 1994) (defining court's objective as

"issue-finding" and not "issue-resolution"). At this stage, a court does not engage in trial-like "[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (citation omitted). Instead, in considering the record, a court must "resolve all ambiguities and draw all reasonable inferences against the movant." *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (citation omitted). If the court subsequently determines that, even "with all permissible inferences and credibility questions resolved in favor" of the non-moving party, "there can be but one reasonable conclusion as to the verdict"—that is, for the moving party—summary judgment is appropriate. *Kaytor*, 609 F.3d at 546 (quoting *Liberty Lobby*, 477 U.S. at 250).

The moving party bears the initial burden of establishing that there are no genuine disputes as to any material facts. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Generally, the burden then shifts to the non-moving party to "'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (quoting *Celotex*, 477 U.S. at 324). Where, as here, a summary judgment motion is unopposed, a court "must still assess whether the moving party has fulfilled its burden of demonstrating that there is no genuine issue of material fact and its entitlement to judgment as a matter of law." *Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). While Local Civil Rule 56.1(b) "permits the court to conclude that the facts asserted in the [Rule 56.1] statement are uncontested and admissible" where a nonmoving party fails to respond, *T.Y. v. New York City Dep't of Educ.*, 584 F.3d at 418, the court "may not rely solely on the statement of undisputed facts

contained in the moving party's Rule 56.1 statement. It must be satisfied that the citation to evidence in the record supports the assertion." *Vt. Teddy Bear Co.*, 373 F.3d at 244; *accord Jackson v. Fed. Exp.*, 766 F.3d 189, 194 (2d Cir. 2014) ("Before summary judgment may be entered, the district court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed."). The Court is also mindful that "the submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (citation omitted); *accord Warren v. Goord*, 579 F. Supp. 2d 488, 493 & n.5 (S.D.N.Y. 2008), *aff'd*, 368 F. App'x 161 (2d Cir. 2010).

**B.    Exhaustion of Administrative Remedies**

**1.    Legal Standard under the PLRA**

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This "exhaustion requirement applies to 'all prisoners seeking redress for any prison circumstances or occurrences,' whether it was a particular episode or an ongoing circumstance." *Charles v. Gordon*, No. 12-CV-8332 (CM) (JCF), 2013 WL 6667632, at *3 (S.D.N.Y. Dec. 17, 2013) (quoting *Porter v. Nussle*, 534 U.S. 516, 519 (2002)). "The PLRA requires 'proper exhaustion' of prison administrative remedies, which includes compliance with agency deadlines and procedural rules." *Morrison v. Stefaniak*, 523 F. App'x 51, 52 (2d Cir. 2013) (quoting *Woodford v. Ngo*, 548 U.S. 81, 90 (2006)).

"In order to exhaust . . . inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004). While courts have noted that this "burden is not a heavy one," analogizing it to notice pleading, *Singh v. Lynch*, 460 F. App'x 45, 47 (2d Cir. 2012), a grievance still must describe the alleged misconduct at issue. *See e.g.*, *id.* (plaintiff's grievance against corrections officer did not include allegation regarding assault and therefore did not alert officials to specific claim); *Espinal v. Goord*, 558 F.3d 119, 126-27 (2d Cir. 2009) (plaintiff's failure to assert existence of conspiracy to assault him did not render claim unexhausted because he described assault itself).

A failure to properly exhaust a prison's administrative remedies may be excused under only three circumstances. *See Messa v. Goord*, 652 F.3d 305, 309 (2d Cir. 2011) (citing *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004)). First, a court must determine whether administrative remedies were, in fact, "available" to the inmate. *Hemphill*, 380 F.3d at 686 (citing *Abney v. McGinnis*, 380 F.3d 663, 667 (2d Cir. 2004)). If administrative remedies were not available, then the exhaustion requirement is inapplicable. *Id.* Second, even if administrative remedies were available, the court must determine whether "defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citing *Ziemba v. Wezner*, 366 F.3d 161, 163 (2d Cir. 2004)). Third and finally, if administrative remedies were available to the inmate and defendants have not forfeited their non-exhaustion defense, the court should consider

whether "special circumstances," justify the inmate's failure to exhaust his administrative remedies. *Id.* (citing *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir. 2004)).[2]

The New York State Department of Corrections and Community Supervision requires prisoners to grieve alleged misbehavior using a three-tier procedure. *See, e.g., Morrison,* 523 F. App'x at 51; *Espinal,* 558 F.3d at 125. First, the inmate must file a complaint with the Inmate Grievance Resolution Committee ("IGRC") within 21 days of the alleged occurrence; second, the inmate must appeal any adverse decision from the IGRC to the superintendent of the correctional facility within seven days; and, third, the inmate must appeal any adverse decision by the superintendent to the Central Office Review Committee ("CORC") within seven days of that decision. N.Y. Comp. Codes R. & Regs. tit. 7 § 701.5 ("N.Y.C.R.R."). Courts in this Circuit require an inmate to appeal even if he does not receive a response to his initial grievance. *See, e.g., Garcia v. Heath,* No. 12-CV-4695 (CM), 2013 WL 3237445, at *5 (S.D.N.Y. June 25, 2013) ("[C]ourts have recognized that a prisoner who receives no response to a § 701.5

---

[2] The Second Circuit has reserved the question of whether the three-part test set forth in *Hemphill* remains viable in light of the Supreme Court's interpretation of the PLRA's exhaustion requirement in *Woodford v. Ngo,* 548 U.S. 81 (2006). *See Dabney v. Pegano,* 2015 WL 664562, at *2 n.1 (2d Cir. Feb. 17, 2015); *Amador v. Andrews,* 655 F.3d 89, 102 (2d Cir. 2011). The Second Circuit has, however, explicitly rejected the argument that *Woodford* abrogated the "exemption to the PLRA for inmates to whom the normal grievance system was unavailable." *Johnston v. Maha,* 460 F. App'x 11, 15 n.6 (2d Cir. 2012). Additionally, while "[c]ourts in this circuit have acknowledged the tension between *Woodford* and *Hemphill,* [they] have continued to use the *Hemphill* test in the absence of circuit authority to the contrary." *Kasiem v. Switz,* 756 F. Supp. 2d 570, 576 n.5 (S.D.N.Y. 2010); *see also Smith v. City of New York,* No. 12-CV-3303 (CM), 2013 WL 5434144, at *9 (S.D.N.Y. Sept. 26, 2013) ("In the absence of a clear indication that *Hemphill* has been overruled, this Court has no choice but to treat it as good law."). Thus, because the Second Circuit has not held otherwise, this Court will similarly consider the exceptions provided in *Hemphill.*

grievance must file an appeal within a reasonable time."); *Hecht v. Corr. Officer Best*, No. 12-CV-4154 (CM), 2012 WL 5974079, at *3 (S.D.N.Y. Nov. 28, 2012) (plaintiff obligated to appeal "within a reasonable period of time" after failing to get response from prison superintendent). The regulations also provide a procedure to ensure that inmates in the SHU are able to file grievances. *See* 7 N.Y.C.R.R. § 701.7 ("The following minimal standards shall be instituted to provide SHU inmates with access to the IGP.").

### 2.    Gomez Failed to Exhaust His Claims

There is no record that Gomez completed the multi-step grievance process as required to properly exhaust his claims. *See* Bellamy Decl., Ex. A (records of Gomez's exhausted grievances). For purposes of evaluating exhaustion, there are two distinct periods at issue here: before Gomez was placed in the SHU on September 23, 2008 (the "first period"), and after (the "second period"). With regard to the first period, Gomez has not alleged any facts (either in his pleadings or at his deposition) that might excuse his failure to exhaust his administrative remedies for incidences occurring before he was relocated to the SHU (that is, his religious accommodation claims against Rabbi Chill). His explanation for his failure to exhaust relates only to the alleged misconduct of a Green Haven corrections officer *after* Gomez entered the SHU. *See* Gomez Dep. at 42-44. Therefore, his claims against Rabbi Chill that accrued before he entered the SHU should be dismissed as unexhausted.

With regard to the second period, there remain questions of fact about the conduct of the corrections officer who Gomez alleges intercepted his grievances while he was in the SHU and threatened Gomez not to file other grievances. Were Gomez's

12

allegations proven to be true, such conduct might well have rendered administrative remedies unavailable to Gomez, and thus estop Defendants from asserting non-exhaustion as a defense, or form the basis of "special circumstances" excusing exhaustion. *See Hemphill*, 380 F.3d at 686-90. Nevertheless, a hearing is not necessary to resolve this issue at this time because, as discussed in the following sections of this Report, Gomez's claims against both Rabbi Chill and Koskowski with respect to occurrences while Gomez was in the SHU fail on the merits.[3] In the interest of completeness, however, the Court will examine the viability of each of the potential excuses for failure to exhaust.

### a.   Availability of Administrative Remedies

First, the Court examines whether "administrative remedies were not in fact 'available'" to Gomez while he was in the SHU. *Messa*, 652 F.3d at 309 (quoting *Hemphill*, 380 F.3d at 686). The question at this step is an objective one, "that is, would 'a similarly situated individual of ordinary firmness' have deemed [the grievance procedure] available." *Hemphill*, 380 F.3d at 688 (citation omitted).

Defendants argue that, even assuming a corrections officer intercepted Gomez's grievances, the record still demonstrates that the grievance procedure was not rendered unavailable. Defs. Mem. at 14-16. For this argument, they rely on *Thomas v. New*

---

[3] Because "[f]actual disputes relating to whether a prisoner's failure to exhaust should be excused . . . do not ordinarily present a jury question," courts in this Circuit have held pre-trial evidentiary hearings on exhaustion when the question cannot be resolved based on the parties' submissions. *Rickett v. Orsino*, No. 10-CV-5152 (CS) (PED), 2013 WL 1176059, at \*9 (S.D.N.Y. Feb. 20, 2013) (citing *Messa v. Goord*, 652 F.3d 305 (2d Cir. 2011)), *adopted by*, 2013 WL 1155354 (S.D.N.Y. Mar. 21, 2013); *see, e.g.*, *Dennis v. Hopkins*, No. 06-CV-3868 (FPS), 2013 WL 3975940, at \*1 (S.D.N.Y. July 30, 2013); *Brown v. Mewar*, No. 07-CV-00551 (LGF) (WMS), 2011 WL 573566, at \*11 (W.D.N.Y. Feb. 14, 2011), *adopted by*, 2011 WL 891403 (W.D.N.Y. Mar. 9, 2011).

*York State Dep't of Corr. Servs.*, No. 00-CV-7163 (NRB), 2002 WL 31164546, at *2-3 (S.D.N.Y. Sept. 30, 2002), for the proposition that a prison's grievance procedure is not "unavailable" unless the inmate has made a "reasonable attempt" to file a grievance that was thwarted by prison officials. Defs. Mem. at 15. They go on to argue that Gomez did not make a "reasonable attempt" to grieve the claims remaining in this action because the grievances he allegedly attempted to submit while in the SHU only addressed the September 23, 2008 assault, not his religious accommodation claim against Rabbi Chill or his deliberate indifference claim against Koskowski. *Id.* at 15-16 (citing Gomez Dep. at 48-55).

While this may be true, interception of an inmate's grievance is not the only means by which a prison's grievance process may be deemed unavailable. Threats made to a prisoner about filing future grievances may also render a grievance process unavailable. In *Hemphill*, the Second Circuit remanded "on the question of whether some seemingly available remedies were rendered unavailable by the threats [plaintiff] received." 380 F.3d at 688. The *Hemphill* court explained that "threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance." *Id.*; *see, e.g., Smith*, 2013 WL 5434144, at *9 ("Where an inmate is threatened with retaliation if he files a grievance, his failure to exhaust his administrative remedies may (or may not) be excusable on all three grounds."); *Lunney v. Brureton*, No. 04-CV-2438 (LAK) (GWG), 2007 WL 1544629, at *9 (S.D.N.Y. May 29, 2007) (collecting cases where threats excused failure to exhaust), *objections overruled*, 2007 WL 2050301 (S.D.N.Y. July 18, 2007); *cf. Mateo v. Bristow*, No. 12-CV-5052 (RJS) (GWG), 2014 WL 4631569, at *10 (S.D.N.Y. Sept. 17, 2014) (finding remedies available

14

"[i]n the absence of any threat against [plaintiff] about filing future grievances"),

*adopted by*, 2015 WL 925933 (S.D.N.Y. Mar. 4, 2015).

Defendants have ignored the potential relevance of Gomez's testimony that, after he submitted his second grievance while in the SHU, he was "threatened by CO Phillips to not file any more paperwork if [he] knew what was good for [him]." Gomez Dep. at 44-45; *see also id.* at 42. Whether any corrections officer actually threatened Gomez as he alleges is therefore a fact that remains in dispute. *See* Defs. Mem. at 15. Were this fact proven at trial, or in a pre-trial hearing as Defendants propose, a factfinder could conclude that such a threat would have deterred a prisoner of "ordinary firmness" from filing any other grievances. *Hemphill*, 380 F.3d at 688. However, because Gomez's claims against Rabbi Chill and Koskowski may be dismissed on the merits, the questions that remain regarding exhaustion on this ground are not dispositive of the pending motion.

### b.     Estoppel

Second, assuming that administrative remedies were available to Gomez, the Court will next consider whether Defendants should be estopped from raising Gomez's failure to exhaust as a defense. Here, Defendants restate the argument raised and rejected by the Court on their motion to dismiss, that Defendants have not forfeited their exhaustion defense because they did not personally prevent Gomez from filing his grievances, another Green Haven official allegedly did. Defs. Mem. at 14; *see JCG v. Ercole*, 2014 WL 1630815, at *8 n.14. The Court is no more persuaded now than it was before that Defendants' lack of personal involvement *necessarily* means they are entitled to rely on lack of exhaustion as a defense.

However, based on the record developed during discovery, it is clear that no one—Defendants or any other Green Haven staff member—could have intercepted a grievance related to the claims remaining in this action because, by Gomez's own admission, neither of the allegedly-intercepted grievances involved Rabbi Chill or Koskowski. At his deposition, in response to the question, "do you remember . . . what you wrote in those grievances," Gomez responded "sure," and proceeded to describe the September 23 attack and having his personal property confiscated. Gomez Dep. at 48-50. He explicitly stated that he did not include Koskowski in these grievances "because [they] were done prior to the hearing." *Id.* at 51.[4] Therefore, even if Green Haven officers stymied Gomez's attempts to grieve the September 23 attack and the theft of his personal property, Defendants should not be estopped from asserting Gomez's lack of exhaustion of the claims at issue in this action.[5]

### c.   Special Circumstances

Gomez has not asserted that any "special circumstances" prevented his compliance with Green Haven's grievance procedures. "The most commonly recognized

---

[4] Although Gomez testified that he did not include his complaints against Koskowski in his grievances because he filed them before the disciplinary hearing giving rise to Gomez's claim against Koskowski began, Gomez Dep. at 51, Gomez's description of the timeline of his grievances suggests that they were filed during the pendency of the disciplinary hearing. *See id.* at 42 (filed first grievance one or two weeks after September 23 attack and, after not receiving response to first grievance, filed second grievance three weeks later); Koskowski Decl., ¶ 6 (disciplinary hearing began on October 1). Regardless of this chronological inconsistency, Gomez was clear at his deposition that his grievances involved only the September 23 attack and theft of his personal property.

[5] The alleged threats regarding future grievances could potentially also form the basis of an estoppel argument were Gomez deterred from grieving the claims at issue here. *See Hemphill*, 380 F.3d at 688-89 (remanding where corrections officer told plaintiff he "better drop" his grievances).

16

special circumstances are where the inmate reasonably misunderstood the relevant grievance procedures." *Smith*, 2013 WL 5434144, at *8; *see, e.g., Giano*, 380 F.3d at 678-79 (finding plaintiff's misinterpretation of prison regulations reasonable); *Reynoso v. Swezey*, 238 F. App'x 660, 663 (2d Cir. 2007) (finding plaintiff's interpretation of grievance procedure not reasonable). Gomez has not expressed any misunderstanding of Green Haven's grievance procedure (reasonable or not), and his failure to exhaust his administrative remedies should not be excused on this ground.[6]

## C.  Gomez's First Amendment Claims Should Be Dismissed

Although the Court recommends that Gomez's First Amendment claims related to the period before Gomez entered the SHU be dismissed for Gomez's failure to exhaust his administrative remedies, the Court will also address Gomez's claims against Rabbi Chill during this period on the merits. As is discussed below, Gomez's claim regarding kosher meals relates only to the time before Gomez entered the SHU, and thus should be dismissed in the alternative as time barred. By contrast, Gomez's claim against Rabbi Chill regarding attendance at religious services spans his entire incarceration at Green Haven. The claim as it relates to the period before Gomez entered the SHU should survive summary judgment were it not otherwise unexhausted without excuse. Although issues of fact remain regarding exhaustion for the period of time that Gomez was in the SHU, Gomez's claim that Rabbi Chill prevented him from attending religious services during this time should be dismissed on the merits regardless of Gomez's failure to exhaust.

---

[6] As previously noted, in *Hemphill*, the Second Circuit recognized that threats regarding the filing of future grievances could form the basis of any of the three excuses for failure to exhaust, including special circumstances. 380 F.3d at 690.

### 1.   Gomez's Claim Regarding Kosher Meals is Time Barred

Section 1983 actions filed in New York are subject to a three-year statute of limitations. *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013) (citing *Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002) and N.Y. C.P.L.R. § 214). Generally, claims brought pursuant to § 1983 accrue when a plaintiff "knows or has reason to know of the injury which is the basis of his action." *Hogan*, 738 F.3d at 518 (quoting *Pearl*, 296 F.3d at 80) (internal quotation marks omitted); *accord Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994). However, where a plaintiff alleges a continuing violation, "commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." *Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009) (citation omitted); *accord Harris v. City of New York*, 186 F.3d 243, 248 (2d Cir. 1999).

Gomez initiated this action on September 16, 2011 according to the prison mailbox rule for calculating the date of filing. *See* Complaint (Dkt. No. 1); *Dory v. Ryan*, 999 F.2d 679, 682 (2d Cir. 1993) ("[A] *pro se* prisoner's [pleading] [is] filed when delivered to prison officials for transmittal to the court.") (citing *Houston v. Lack*, 487 U.S. 266, 270 (1988)).[7] Ordinarily, therefore, anything occurring before September 16, 2008 would be time barred. However, because Gomez alleges a continuing violation of his right to receive kosher meals while incarcerated at Green Haven, *see* Am. Compl.

---

[7] As discussed in the Court's Report & Recommendation with respect to defendants' motion to dismiss, there is no definitive evidence that Gomez's complaint and IFP application—which are dated September 14 and 16, 2011, respectively (Dkt. Nos. 1-2)—were mailed to the Court "in the same packet," as Defendants suggest. *See* 2014 WL 1630815, at *4 n.7. Nevertheless, as with the motion to dismiss, whether the filing date is September 14 or 16 is immaterial because the two-day difference does not impact any of my recommendations.

¶¶ 4-6, 32, his claim would be timely if the "last discriminatory act" took place on or after September 16, 2008. *Shomo*, 579 F.3d at 181.

Here, there is no question that, as of August 2008, Gomez began receiving kosher meals at Green Haven. On August 4, 2008, prison officials approved Gomez's request for kosher meals, and Gomez testified that it took "less than one week" after receiving the memorandum of approval to begin receiving kosher meals. *See* Albanese Decl., Ex. F (Memorandum from Robert Cunningham, Deputy Superintendent for Programs to Gomez dated Aug. 4, 2008); Gomez Dep. at 83. Therefore, in addition to being unexhausted, this claim is time barred and should be dismissed on this ground as well.

### 2.   Gomez's Claim Regarding Religious Services

Gomez also alleges that Rabbi Chill prevented him from attending religious services during the entirety of his incarceration at Green Haven. "It is well settled that inmates are afforded constitutional protection to practice their religion under the Free Exercise Clause of the First Amendment." *Williams v. King*, No. 11-CV-1863 (SAS), 2014 WL 3925230, at *5 (S.D.N.Y. Aug. 11, 2014) (citing *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003)). This includes the "right to participate in congregate religious services . . . Confinement in keeplock does not deprive prisoners of this right." *Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993) (internal citations omitted); *see also Ford*, 352 F.3d at 597 ("[A] prisoner's free exercise right to participate in religious services is not extinguished by his or her confinement in special housing or keeplock."). However, an inmate's freedom of religion is not absolute, and must be balanced against "the interests of prison officials charged with complex duties arising from administration of the penal system." *Ford*, 352 F.3d at 588 (citation omitted).

To prove a Free Exercise claim, a plaintiff must make a "threshold" showing that "the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin v. Goord*, 467 F.3d 263, 274-75 (2d Cir. 2006). "The defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct." *Id.* at 275. Finally, the burden shifts back to the plaintiff "to show that these [articulated] concerns were irrational." *Id.* (citation omitted) (alteration in original). For the reasons that follow, the Court recommends that Gomez's Free Exercise claim be dismissed for the period that he was in the SHU. By contrast, the Court finds that, were Gomez's claim with respect to his time in Green Haven's general population not otherwise unexhausted without excuse, it would survive summary judgment because Defendants have failed to identify a penological interest justifying the alleged impingement.

### a.   Questions of Fact Remain Regarding the Substantial Burden to Gomez's Sincerely Held Religious Beliefs

Defendants have not challenged the sincerity of Gomez's religious beliefs, and there is nothing in the record to contradict Gomez's assertion that he is a "Messianic Jew" or to question the sincerity of his desire to attend Jewish services. *See* Gomez Dep. at 84-85. Accordingly, for present purposes, the Court assumes that Gomez's desire to attend Jewish religious services was sincere.

The question then becomes whether Rabbi Chill prevented Gomez from attending religious services, and if so, whether this conduct placed a substantial burden on Gomez's religious practice. On this point, there is a genuine dispute of material fact. Throughout this action, in both his pleadings and during his deposition, Gomez has maintained that Rabbi Chill denied him the ability to attend any Jewish services at

Green Haven because he believed that Gomez's particular criminal conduct rendered him "not Jewish." Gomez Dep. at 78, 83-84; *see also* Am. Compl. ¶¶ 4-5. Rabbi Chill has submitted a declaration in which he contends that "there is no merit to [Gomez's] claim." Chill Decl., ¶ 2. Although Rabbi Chill stated that he "does not recall [Gomez] individually," his conclusion about Gomez's claim appears to be based on his policy to "make weekly rounds in the SHU to offer chaplain services to all inmates who have listed their religion as Jewish" and to "offer religious services to all inmates at Green Haven who are listed as Jewish, regardless of their crime of conviction." *Id.* at ¶ 4, 6.

If Rabbi Chill did, in fact, prevent Gomez from attending Jewish services, this would likely suffice to show that Gomez's religious beliefs were substantially burdened. While Gomez has not alleged the number of times that Rabbi Chill prevented him from attending services, Gomez testified that he "practice[s] the Sabbath" and goes to services for Yom Kippur, Rosh Hashanah, "and all the other . . . customary services." Gomez Dep. at 85. A substantial burden is one which requires "an adherent to modify his behavior and to violate his beliefs." *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) (quoting *Thomas v. Review Bd. of the Indiana Employment Sec. Div.*, 450 U.S. 707, 718 (1981)). It is well-established that preventing an inmate from attending congregate religious services may constitute a substantial burden, even if there is some disagreement as to the precise number of religious services that can be missed before a substantial burden arises. *See, e.g.*, *Blalock v. Jacobsen*, No. 13-CV-8332 (JMF), 2014 WL 5324326, at *7 (S.D.N.Y. Oct. 20, 2014) (missing two religious services is not substantial burden); *Covington v. Mountries*, No. 13-CV-343 (VEC), 2014 WL 2095159, at *4 (S.D.N.Y. May 20, 2014) (denying motion to dismiss because missing two religious

services may constitute substantial burden); *Robinson v. Jimenez*, No. 08-CV-902 (NGG) (LB), 2012 WL 1038917, at *6 (E.D.N.Y. Mar. 6, 2012) (noting disagreement among courts in Second Circuit on this question), *adopted by*, 2012 WL 1039825 (E.D.N.Y. Mar. 28, 2012).

### b.   Legitimate Penological Interests

Although questions remain regarding whether Gomez was denied access to religious services, Defendants may still prevail on summary judgment by satisfying their burden to identify a legitimate penological interest that justifies denying Gomez the right to attend religious services. When determining whether a penological interest is reasonably related to an alleged deprivation, a court must examine four factors: "[1] whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; [2] whether prisoners have alternative means of exercising the burdened right; [3] the impact on guards, inmates, and prison resources of accommodating the right; and [4] the existence of alternative means of facilitating exercise of the right that have only a *de minimis* adverse effect on valid penological interests." *Salahuddin*, 467 F.3d at 274 (citing *Turner v. Safley*, 482 U.S. 78, 90-91 (1987)).

To this end, Defendants cite to DOCCS Directive No. 4933 to argue that Gomez "did not have the right[,] based on recognized penological interests, to attend congregate services while in [the] SHU." Defs. Mem. at 19; *see also* Chill Decl., Ex. A (DOCCS Directive No. 4933 dated Jan. 20, 2004). This directive governs prisoners in the SHU, and prohibits their "[a]ttendance at congregate religious services." DOCCS Directive No. 4933, § 304.9(d). As an alternative to congregate services, the Directive

22

provides that the "facility senior chaplain or a designated member of the ministerial services staff will be required to make a minimum of one round per week in the SHU." *Id.* at § 304.9(b). The Directive, combined with the circumstances surrounding Gomez's relocation to the SHU, suffice to establish a legitimate interest while Gomez was in the SHU. In making their argument, however, Defendants have ignored Gomez's allegations regarding his inability to attend services before entering the SHU, and Defendants' reliance on a DOCCS directive governing prisoners in the SHU is therefore unavailing for this time period.

### i. There Were Legitimate Penological Interests When Gomez Was in the SHU

Defendants argue that other courts in this Circuit have determined that DOCCS Directive No. 4933 serves a legitimate penological purpose. *See* Defs. Mem. at 19 (collecting cases). However, pointing to a prison policy does not end the inquiry. As the Second Circuit has explained, a defendant must "close the circle" by showing "that the disputed official conduct was *motivated by* a legitimate penological interest." *Salahuddin*, 467 F.3d at 276-77 (emphasis added); *accord Bowens v. Smith*, No. 9:11-CV-784 (GLS) (ATB), 2015 WL 236270, at *8 (N.D.N.Y. Jan. 16, 2015) ("Prohibiting a particular inmate's attendance at congregate religious services because he is housed in Ad Seg does not violate the First Amendment *if the restriction serves a valid penological purpose.*") (emphasis in original); *Booker v. Maly*, No. 9:12-CV-246 (NAM) (ATB), 2014 WL 1289579, at *23 (N.D.N.Y. Mar. 31, 2014) (citing Directive No. 4933 and prison official's affidavit about specific risks related to plaintiff), *aff'd*, 590 F. App'x 82 (2d Cir. 2015). Stated differently, "defendants' burden on summary judgment is to 'point[] to [something] in the record suggesting that the [denial of religious exercise] *was viewed*

23

*as* preventing [threats to inmate safety].'" *Salahuddin*, 467 F.3d at 277 (quoting *Turner*, 482 U.S. at 98) (emphasis and alteration in original).  This is because, as the Second Circuit earlier recognized, "not all segregated prisoners are potential troublemakers." *Salahuddin v. Jones*, 992 F.2d 447, 449 (2d Cir. 1993) (citation omitted).

Although Defendants have not explicitly connected Gomez's inability to attend congregate religious services while in the SHU to a specific penological interest, the undisputed record reflects that Gomez's relocation to the SHU was motivated by an interest in maintaining prison safety.  Gomez entered the SHU on September 23, 2008, pending a disciplinary hearing into allegations that he had attempted to solicit the assault of a Green Haven corrections officer.  *See* Rule 56.1 Stmt. ¶¶ 15, 26-27.  While the truth of this allegation was being determined, it was reasonable to keep Gomez separated from the prison population and corrections officers to protect their safety, instead allowing Gomez to receive weekly religious counselling from Rabbi Chill in the SHU.  *Compare Salahuddin*, 992 F.2d at 449 (legitimate penological interest found where plaintiff was in the SHU for fighting another inmate), *with Salahuddin*, 467 F.3d at 276-77 (denying summary judgment where no evidence that inmate whom plaintiff assaulted was at same prison).

After Koskowski dismissed the assault charges against him, Gomez remained in the SHU until his transfer to another facility.  At this point, the penological interest reasonably became keeping Gomez safe from those inmates who made the false allegations against him and the corrections officers who allegedly assaulted him.  Koskowski recommended that Gomez be transferred to another prison "to avoid

potential problems [with] confidential witness and staff." Koskowski Decl. ¶ 7, Ex. A
(disposition form dated Nov. 7, 2008, GOMEZ37). Koskowski's supervisor agreed, and
advised Gomez that he would remain in the SHU pending transfer to another prison
because "the NYS DOC[C]S has a duty to keep you as safe as possible while in our
custody," and during the hearing there was testimony that Gomez had "problems [with]
other inmates." Albanese Decl., Ex. B (Administrative Segregation Hearing
Determination dated Nov. 20, 2008, GOMEZ181). Therefore, a legitimate penological
interest justified any denial of Gomez's right to attend congregate religious services
while he was in the SHU.

Application of DOCCS Directive No. 4933 in this manner also satisfies the
reasonableness test outlined in *Turner v. Safley*. First, as discussed, the regulation is
related to the valid interest of keeping prison inmates and employees safe. Second, the
regulation provided Gomez with alternative means of exercising his religion. He was
not prevented from praying in his cell and he could have requested religious counseling
in the SHU.[8] Third, "[w]hen accommodation of an asserted right will have a significant

---

[8] In his Amended Complaint, Gomez alleged that Rabbi Chill denied him the right to
"attend services, holidays and [his] right to a Rabbi." Am. Compl. ¶ 32. Gomez did
not allege that Rabbi Chill refused to provide religious counseling to him while he was
in the SHU. Similarly, throughout his deposition, Gomez asserted that Rabbi Chill
prevented him from "attend[ing] Jewish services." Gomez Dep. at 71; *see also id.* at
78, 84. Although some of Gomez's deposition testimony might be read to suggest that
Rabbi Chill also refused to provide religious counseling, *see id.* at 80, 96, the Court is
not obligated to scour a plaintiff's deposition testimony for potential causes of action
not otherwise clearly pleaded or articulated, even if the plaintiff is proceeding *pro se*.
*See, e.g., Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470-71 (2d Cir. 2002)
(court is not obligated to independently review record to find factual disputes); *Gee v.
Fischer*, No. 9:09-CV-1057 (MAD) (RFT), 2011 WL 4965297, at *8 (N.D.N.Y. Sept. 21,
2011) (rejecting *pro se* plaintiff's attempt to add claim in his opposition to summary
judgment motion), *adopted by*, 2011 WL 4965038 (N.D.N.Y. Oct. 19, 2011).

ripple effect on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Diggs v. Volpe*, No. 11-CV-6382 (KPF), 2013 WL 4015758, at *10 (S.D.N.Y. Aug. 7, 2013) (quoting *Turner*, 482 U.S. at 90) (internal quotation marks omitted). Fourth, and finally, the "alternative means of facilitating exercise of the right" are provided by the Directive's requirement that a member of Green Haven's religious staff perform weekly rounds in the SHU.[9]

### ii.    There Were No Legitimate Penological Interests Before Gomez Was in the SHU

While a legitimate penological interest justified keeping Gomez from congregate religious services while he was in the SHU, Gomez has asserted that Rabbi Chill prevented him from attending Jewish services during his entire incarceration at Green Haven. Gomez Dep. at 85 ("Q: Were you able to attend any of those [religious services] at all during your stay at Green Haven? A: None. None at all."). Although the Court offered Defendants an additional opportunity to address the period of time that Gomez was in Green Haven's general population after they filed their moving papers (Dkt. No. 143), Defendants have not identified any legitimate penological interest relevant to this time period. Rather, they rely exclusively on the argument that Gomez failed to

---

[9] The burden then shifts back to Gomez to demonstrate that preventing him from attending congregate religious services while in the SHU, due to a concern for his safety or the safety of other inmates and corrections officers, was irrational, which he has not done. According to Gomez, he was attacked by a number of corrections officers on the same day that he was taken to the SHU based on the false allegations of other inmates. Gomez Dep. at 117-21. Under these circumstances, it was rational to maintain Gomez's safety and the safety of the corrections officer whom Gomez was falsely accused of attempting to assault by relocating Gomez to the SHU and disallowing his attendance at congregate services.

exhaust his administrative remedies with respect to this claim. (Dkt. No. 144).[10]

Although the Court has recommended dismissal of this portion of Gomez's Free

Exercise claim on exhaustion grounds, were Judge McMahon to excuse Gomez's failing,

Defendants have not met their burden to identify any legitimate penological interest

that would support Gomez's alleged inability to attend Jewish services before he

entered the SHU.

**D.    Gomez's Eighth Amendment Claim Should Be Dismissed**

Gomez separately contends that Koskowski violated the Eighth Amendment by

his deliberate indifference to Gomez's medical needs resulting from the September 23

assault.  The Eighth Amendment "imposes a duty upon prison officials to ensure that

inmates receive adequate medical care." *Salahuddin*, 467 F.3d at 279 (citing *Farmer v.

Brennan*, 511 U.S. 825, 832 (1994)).  To prove an Eighth Amendment violation arising

out of inadequate medical treatment under § 1983, "a prisoner must prove 'deliberate

indifference to [his] serious medical needs.'" *Chance v. Armstrong*, 143 F.3d 698, 702

(2d Cir. 1998) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)) (alteration in

---

[10] To the extent that Defendants' reference to the brief period of time between the
beginning of the statute of limitations period (September 16, 2008) and Gomez
entering the SHU (September 23, 2008) can be construed as an argument that any
denial of religious accommodation during this period was *de minimis*, this argument
fails. *See* Defs. Mem. at 18.  First, Defendants ignore that Gomez alleged a
continuing violation of his right to attend religious services from the time he arrived
at Green Haven in May 2008. *See* Am. Compl. ¶ 32; Gomez Dep. at 85.  Therefore, the
period prior to September 16, 2008 is relevant when evaluating the merits of Gomez's
claim.  Second, as noted above, courts in this Circuit have found that denying
attendance at even one or two religious services may constitute a constitutional
violation where, as here, no explanation is provided. *See, e.g.*, *Covington*, 2014 WL
2095159, at *4-5; *cf. Guillory v. Ellis*, No. 9:11-CV-600 (MAD) (ATB), 2014 WL
4365274, at *9 (N.D.N.Y. Aug. 29, 2014 (dismissing claim where defendants provided
valid reason for plaintiff missing one religious service).

original). The test for deliberate indifference under § 1983 involves both objective and subjective elements. First, a plaintiff must demonstrate that the deprivation of care is objectively, "sufficiently serious." *Salahuddin*, 467 F.3d at 279-80; *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003). Second, a plaintiff must show that the defendant acted with a sufficiently culpable state of mind, that is, that he exhibited "deliberate indifference" to plaintiff's serious medical need. *Id.*

In analyzing the objective element, a court must determine "whether the prisoner was actually deprived of adequate medical care," and, second, "whether the inadequacy in medical care is sufficiently serious." *Salahuddin*, 467 F.3d at 279-80. A deprivation is sufficiently serious "in the sense that 'a condition of urgency, one that may produce death, degeneration or extreme pain' exists." *Carrasquillo v. City of New York*, 324 F. Supp. 2d 428, 439 (S.D.N.Y. 2004) (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)). When a plaintiff alleges that the defendant denied him medical treatment altogether, a court examines the severity of the underlying medical condition. *Salahuddin*, 467 F.3d at 280. "Factors relevant to the seriousness of a medical condition include whether 'a reasonable doctor or patient would find [it] important and worthy of comment,' whether the condition 'significantly affects an individual's daily activities,' and whether it causes 'chronic and substantial pain.'" *Id.* (quoting *Chance*, 143 F.3d at 702) (alteration in original). However, when a plaintiff alleges that medical treatment he received was inadequate, the inquiry is "narrower" and the court considers the severity of the inadequacy "and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin*, 467 F.3d at 280.

The subjective element requires a plaintiff to show that the defendant was deliberately indifferent to the plaintiff's serious medical need. Deliberate indifference has been described as "the equivalent to criminal recklessness." *Carrasquillo*, 324 F. Supp. 2d at 439; *accord Salahuddin*, 467 F.3d at 280. "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety.'" *Chance*, 143 F.3d at 702 (quoting *Farmer*, 511 U.S. at 837). To meet this standard, "[t]he charged official must be subjectively aware that his conduct creates such a risk;" however, a "defendant's belief that his conduct poses no risk of serious harm (or an insubstantial risk of serious harm) need not be sound so long as it is sincere." *Salahuddin*, 467 F.3d at 281.

Gomez alleged that Koskowski was deliberately indifferent to his medical condition because, after seeing Gomez "hopping on one foot and hanging on to objects for balance" at his disciplinary hearing, Koskowski failed to direct that Gomez be transferred from the SHU to Green Haven's infirmary or provided with a cane or crutches. Am. Compl. ¶ 11; *see also* Gomez Dep. at 109, 178-79. As discussed below, the Court recommends that summary judgment be granted with respect to Gomez's claim against Koskowski. First, the record reflects that Gomez, in fact, received adequate medical care. Second, even if Gomez received no medical care whatsoever, the type of injuries he suffered are not serious enough to form the basis of an Eighth Amendment claim. Finally, the record establishes that Koskowski was not subjectively indifferent to Gomez's medical needs.

### 1.    Gomez Received Adequate Medical Care

The record demonstrates that Gomez received adequate medical care after the alleged assault on September 23, 2008. During his deposition, Gomez acknowledged that he was evaluated by Green Haven's medical staff on the morning of September 23 before being taken to a local hospital for an x-ray in the afternoon. Gomez Dep. at 129-36; *see also* Albanese Decl., Ex. C (excerpted medical records, GOMEZ105, 107, 141-46). The x-ray of Gomez's femur did not reveal a fracture, *see* Albanese Decl., Ex. C (NYSDOCS Request & Report of Consultation, GOMEZ141), and the hospital discharged him with a diagnosis of "contusion" (a bruise), recommending Motrin and that Gomez's leg be iced and kept elevated. *Id.*, Ex. C (Discharge Instructions, GOMEZ146). Gomez also does not dispute that, once back at Green Haven, he was seen and treated by Green Haven medical staff for various complaints on 14 separate occasions after the September 23 incident. Gomez Dep. at 165; *see generally* Albanese Decl., Ex. C (excerpted medical records). As a general matter, therefore, the treatment Gomez received can hardly be described as an "act or omission [that] result[s] in the denial of the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834 (citation omitted).

Instead, Gomez specifically takes issue with the fact that Koskowski did not transfer him from the SHU to the infirmary, where Gomez believes he would have been entitled to use crutches. Gomez Dep. at 112, 178-79. Gomez explained that Koskowski "could have saved [him] the pain and suffering and the discomfort [he] went through in the SHU" by transferring him to the infirmary. *Id.* at 178. However, being denied crutches and the resultant pain, suffering, and discomfort that Gomez has described

does not create a sufficiently serious deprivation because it does "contemplate[] 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.'" *Chance*, 143 F.3d at 702 (citation omitted); *accord Salahuddin*, 467 F.3d at 280 (evaluating "what harm, if any, the inadequacy has caused or will likely cause the prisoner"). There is nothing in the record to suggest that failing to provide Gomez with crutches could, or did, "result in further significant injury or the unnecessary and wanton infliction of pain." *Smith*, 316 F.3d at 187 (citation omitted). Indeed, by October 27, Gomez reported to Dr. Bentivegna that "his leg [was] feeling better." Albanese Decl., Ex. C (Ambulatory Health Record Progress Note dated Oct. 27, 2008, GOMEZ103). *See, e.g.*, *Smith*, 316 F.3d at 187 ("[T]he actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm.").

Moreover, whether Koskowski could have facilitated Gomez receiving crutches is immaterial. The treatment notes from this period reflect that, while the bruise on Gomez's right thigh persisted and he sometimes complained of immobility in his right knee, the medical staff repeatedly found that neither crutches nor a cane were medically indicated. *See, e.g.*, Albanese Decl., Ex. C (Ambulatory Health Record Progress Notes dated Sept. 26, 27, 30, and Oct. 1, 2008, GOMEZ104, 106). The fact that Gomez requested and was denied crutches does not create an Eighth Amendment claim. "[A] prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment." *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011); *see also Chance*, 143 F.3d at 703 ("[M]ere disagreement over the proper treatment does not create a constitutional claim."); *Wandell v. Koenigsmann*, No. 99-CV-8652 (WHP), 2000

31

WL 1036030, at *4 (S.D.N.Y. July 27, 2000) ("Whether an injured prisoner should be provided crutches is a medical judgment as to the appropriate course of treatment, and disagreement with that decision is not actionable under the Eighth Amendment.").

### 2. Gomez's Injury Was Not Serious

Even assuming Gomez had been completely denied medical care, his injury was not sufficiently serious as to form the basis of a deliberate indifference claim. Considering the factors elucidated by the Second Circuit, Gomez has not provided any evidence that his injury "significantly affect[ed] [his] daily activities" or that he suffered from "chronic and substantial pain." *Chance*, 143 F.3d at 702 (citation omitted).

There is no dispute that Gomez experienced pain as a result of his injury. Nonetheless, both Putnam Hospital and Green Haven medical staff deemed this pain insufficient to warrant prescription pain medication. While hospital staff prescribed Vicodin, they recommended non-prescription pain medication. Albanese Decl., Ex. C (Discharge Instructions, GOMEZ146). Green Haven staff then provided Gomez with ibuprofen consistent with the hospital's discharge instructions. *Id.*, Ex. C (Ambulatory Health Record Progress Notes dated Sept. 25 and 27, 2008, GOMEZ106). Dr. Bentivegna also repeatedly determined that Gomez's pain did not warrant crutches or a cane, despite Gomez's requests. *Id.*, Ex. C (Ambulatory Health Record Progress Notes dated Sept. 26, 27, 30, and Oct. 1, 2008, GOMEZ104, 106). Moreover, within approximately one month of the injury, Gomez reported that he was "feeling better." *Id.*, Ex. C (Ambulatory Health Record Progress Note dated Oct. 27, 2008, GOMEZ103). Pain that improved over the course of a month and at no point required prescription

medication or other treatment does not constitute "chronic and substantial pain." *Chance*, 143 F.3d at 702.

As for the injury itself, courts in this Circuit routinely find that bruising and knee pain of the type Gomez has alleged are insufficiently serious. *See, e.g., Rickett v. Orsino*, No. 10-CV-5152 (CS) (PED), 2013 WL 1176059, at *17 (S.D.N.Y. Feb. 20, 2013) (bruising) (collecting cases), *adopted by*, 2013 WL 1155354 (S.D.N.Y. Mar. 21, 2013); *Evering v. Rielly*, No. 98-CV-6718, 2001 WL 1150318, at *9 (S.D.N.Y. Sept. 28, 2001) (bruising); *Perry v. Tichler*, No. 9:06-CV-1361, 2009 WL 1076205, at *4-5 (N.D.N.Y. Apr. 21, 2009) (knee injury); *Guarneri v. Bates*, No. 9:05-CV-444 (GLS) (DRH), 2008 WL 686809, at *7 (N.D.N.Y. Mar. 10, 2008) (knee injury) (collecting cases). Moreover, Gomez's claims regarding his inability to walk cannot elevate the seriousness of his injury because such a claim is unsupported in the record. *See generally* Albanese Decl., Ex. C (excerpted medical records, repeatedly finding Gomez did not require assistive devices to walk); *id.*, Ex. C (Ambulatory Health Record Progress Note dated Oct. 27, 2008, describing Gomez's "mild limp," GOMEZ103). *See, e.g., Perry*, 2009 WL 1076205, at *5 (hopping due to denial of prescribed crutches was not sufficiently serious where no evidence of "excessive pain" or "future illness or suffering"); *Mitchell v. Goord*, No. 9:04-CV-366 (LEK) (DRH), 2007 WL 189087, at *5 (N.D.N.Y. Jan. 22, 2007) (plaintiff's "difficulty walking" did not render him immobile).[11]

---

[11] Gomez also asserts that he suffered tendon damage and a degenerative hip injury as a result of the September 23 incident. *See* Gomez Dep. at 21 (tendon), 32 (hip). With regard to the tendon injury, Gomez acknowledged that he was never diagnosed with tendon damage, but contends that hospital staff needed to perform an MRI to make such a diagnosis. *Id.* at 140. He nevertheless self-diagnosed his tendon injury because "[t]here was a lot of pain" in the back of his leg and he "[c]ould not straighten it out." *Id.* at 141. Similarly, while Gomez alleged that "his hip (right) joint is

### 3.   Koskowski Was Not Deliberately Indifferent

While it is not necessary to evaluate Koskowski's subjective intent because the Court has already determined that Gomez has failed to prove the objective element of his deliberate indifference claim, the record also reflects that Koskowski was not deliberately indifferent to Gomez's medical needs.  To prove this, Gomez needs to show that Koskowski was "subjectively aware" that his conduct created a "substantial risk that serious inmate harm will result." *Salahuddin*, 467 F.3d at 280.

Koskowski's declaration demonstrates that he was not subjectively aware that failing to transfer Gomez to the infirmary or provide him with crutches presented a substantial risk to Gomez's health or safety.  As Koskowski explained, it was his understanding that "both a facility physician and a facility nurse make daily rounds in the SHU to ensure that each inmate's medical and mental health needs are met." Koskowski Decl. ¶ 9.  Therefore, even assuming Koskowski had observed that Gomez had some difficulty walking (a fact which Koskowski disputes, *id.* at ¶¶ 3, 8), he presumed that Green Haven's medical staff was providing Gomez with adequate

---

wearing out at an extremely rapid pace," Am. Compl. ¶ 34; *see also* Gomez Dep. at 32-34, 173-77, he has not adduced any evidence to support this claim.  At the summary judgment stage, such "conclusory allegations [and] unsubstantiated speculation" will not suffice. *Jeffreys*, 426 F.3d at 554 (citation omitted).  As Defendants note, courts in this Circuit often find that an allegation of injuries not documented in the medical record cannot survive summary judgment. *See* Defs. Mem. at 21-22 (citing *Davis v. Klein*, No. 11-CV-4868 (ENV), 2013 WL 5780475, at *4 (E.D.N.Y. Oct. 25, 2013) and *Bove v. New York City*, No. 98-CV-8800 (HB) 1999 WL 595620, at *6 (S.D.N.Y. Aug. 6, 1999)); *see also Brown v. Jeanty*, No. 03-CIV-8712 (LTS) (JCF), 2009 WL 6065754, at *8 (S.D.N.Y. July 23, 2009) ("[C]ourts regularly grant summary judgment where medical records directly contradict a plaintiff's allegations."), *adopted by*, 2010 WL 1047651 (S.D.N.Y. Mar. 22, 2010); *Jackson v. Bederman*, No. 12-CV-1338 (KPF), 2014 WL 2805242, at *20-21 (S.D.N.Y. June 20, 2014) (plaintiff's unsupported allegation regarding effect of failure to provide medical treatment would be insufficient to raise genuine issue of material fact).

medical attention. An official's subjective belief "need not be sound so long as it is sincere." *Salahuddin*, 467 F.3d at 281. The sincerity of Koskowski's belief in the adequacy of Gomez's medical care is not in dispute, and indeed, appears to have been correct. At his deposition, Gomez acknowledged that "the outcome would not have been any different" had Koskowski referred him to the infirmary, only that Koskowski "could have saved [him] the pain and suffering and the discomfort." Gomez Dep. at 178. Therefore, Gomez was not at any risk of serious harm, let alone a substantial risk of harm by virtue of Koskowski's alleged failure to act. Moreover, Koskowski's belief as to the adequacy of treatment being provided by Green Haven's medical staff appears particularly reasonable given that Koskowski is not a medical professional. *See, e.g.*, *Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003) (non-medical professional's "automatic and complete deference" to complained-of medical decision "is not, by itself, sufficient evidence" of deliberate indifference); *Paul v. Bailey*, No. 09-CV-5784 (LAP) (JCF), 2014 WL 1807087, at *8 (S.D.N.Y. May 7, 2014) (finding warden not deliberately indifferent where plaintiff informed him of medical issue because warden believed medical staff was addressing it), *adopted by*, 2014 WL 4694360 (S.D.N.Y. Sept. 11, 2014); *Johnson v. City of New York*, No. 12-CV-8265 (LAK) (HBP), 2014 WL 5393181, at *10 (S.D.N.Y. Oct. 21, 2014) (no evidence that defendants "deliberately delayed treatment with actual knowledge that more prompt action was necessary . . . even if [their] conduct was unreasonable."), *adopted by*, 2014 WL 6455162 (S.D.N.Y. Nov. 17, 2014).

## III.   CONCLUSION

Gomez's religious accommodation claim against Rabbi Chill with respect to the period before he entered the SHU should be dismissed as unexhausted or alternatively,

as time barred.  Gomez's religious accommodation claim against Rabbi Chill with respect to the period after he entered the SHU and his deliberate indifference claim against Koskowski should both be dismissed as without merit.  Accordingly, I recommend that Defendants' motion for summary judgment be granted, and the remaining claims dismissed.

## PROCEDURE FOR FILING OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  *See also* Fed. R. Civ. P. 6.  Such objections, and any responses to such objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Colleen McMahon and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, New York, New York, 10007.  Any requests for an extension of time for filing objections must be directed to Judge McMahon.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL**

**RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE**

**APPELLATE REVIEW.** *See Thomas v. Arn*, 474 U.S. 140 (1985); *Wagner & Wagner,*

*LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92

(2d Cir. 2010); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.  If Gomez does not have access

to the cases cited herein that are reported on Westlaw or Lexis, he should request

copies from Defendants. *See Lebron v. Sanders*, 557 F.3d 76, 79 (2d Cir. 2009).

Dated:   New York, New York
         April 17, 2015

_____

JAMES L. COTT
United States Magistrate Judge

**A copy of this Report & Recommendation has been mailed to the following:**

**Juan C. Gomez**
01-A-0483
Marcy Correctional Facility
P.O. Box 3600
Marcy, N.Y. 13403-3600